## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONIQUE RODWELL<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEWARK, et al.<br><br>Defendant. | Civil Action No. 11-3522 (JLL)<br><br>**OPINION** |

**LINARES,** District Judge.

This matter comes before the Court by way of Defendants City of Newark ("Newark"), Detective Anthony Williams ("Det. Williams"), Detective Mark Armstead ("Det. Armstead"), and Sergeant Jerome Ramsey ("Sgt. Ramsey") (collectively "Defendants")'s motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to Defendants' motion, and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

## I. FACTUAL BACKGROUND

This action arises out of an incident that occurred on October 30, 2009 involving Plaintiff Monique Rodwell ("Plaintiff") and officers of the Newark Police Department. (Def. Statement of Undisputed Material Facts ("Def. SUMF") at ¶ 1.)

### A. Plaintiff's Initial Encounter with the Newark Police Officers

On October 30, 2009 Plaintiff was inside the bathroom of her apartment when she heard a loud noise. (Pl. Supp. SUMF at ¶1.) After hearing the loud noise, Plaintiff went into her living room and saw her cousin, Gerard Crawford ("Crawford"), who had discharged a gun while inside Plaintiff's apartment. (Def. SUMF at ¶¶ 1, 5.) Plaintiff then went down the stairs where she saw Police Officer Cruz ("Officer Cruz"). (Pl. Supp. SUMF at ¶ 1.) Officer Cruz informed Plaintiff that someone had run into the direction of her apartment with a gun. (*Id.* at ¶¶ 1-2.) Plaintiff then invited Officer Cruz into her apartment; upon entering, Officer Cruz observed Crawford in a back room, and immediately placed him under arrest. (*Id.* at ¶ 2.)

Thereafter, Plaintiff's boyfriend, Robert Tyson, located the gun that Crawford brought into the apartment and turned it over to Officer Cruz and two other police officers who had entered the apartment. (*Id.*)

Det. Williams and Det. Armstead were then dispatched to Plaintiff's residence. (Def. SUMF at ¶ 5.) Upon arriving at the scene, Det. Williams saw a bullet hole in the floor and on a chair, and learned that Plaintiff was the leaseholder of the apartment. (Def. SUMF at ¶ 6.) Det. Williams then began questioning Plaintiff as to how Crawford entered her apartment; Plaintiff responded that she did not know how Crawford entered. (Pl. Supp. SUMF at ¶ 4.) During the course of his questioning, Det. Williams determined that Plaintiff was belligerent and agitated. (*Id.* at ¶ 5.) Det. Armstead, by contrast, determined that Plaintiff was cooperative and calm during the questioning. (*Id.*)

Based on Det. Williams' perception of Plaintiff's demeanor, he ordered his patrol unit to transport Plaintiff to the police station for questioning, as she was a potential witness to what had occurred. (*Id.*) Although Plaintiff wanted to ride to the station in her boyfriend's car, the officers instructed her to ride with them in the back of a patrol unit wherein the back seat car

doors could not be opened from the inside. (Def. SUMF at ¶ 9; Pl. Supp. SUMF at ¶¶ 6-7.) Det. Williams acknowledged in his deposition that Plaintiff was free to refuse going to the police station, yet the record suggests that nobody informed Plaintiff of this fact. (Pl. SUMF at ¶ 6; Def. Resp. SUMF at ¶ 6; *see also* Hardaway Cert., Ex. B at 56.)[1]

   B.    Plaintiff's Experience at the Police Station

   Once at the police station, Det. Williams ordered two officers to take Plaintiff to the kitchen area which was used as an interview room. (Pl. Supp. SUMF at ¶ 9; Def. Resp. SUMF at ¶ 9.) While Plaintiff was seated alone in the room, Det. Williams entered and closed the door. (*Id.*) Plaintiff was never informed that she was free to leave the station at any time in spite of the fact that she was not a suspect. (*See* Pl. Supp. SUMF at ¶¶ 8, 13; Def. Resp. SUMF at ¶ 13.) While in the interview room, Det. Williams again questioned Plaintiff about how Crawford entered her apartment and discharged his gun. Plaintiff claims that she responded that she knew nothing about, and had no involvement in, the incident. (Pl. Supp. SUMF at ¶ 10.) According to Plaintiff, Det. Williams then stood over her, pushed her, and poked her in the head while she was seated in a chair. (*Id.*) He also allegedly called her names such as "dirty bitch" and "welfare bitch," slapped her, and hit her head while yelling profanities at her. (*Id.*)[2] Plaintiff then stood from her chair, and Det. Williams instructed her to sit down. (*Id.* at ¶ 11.)

   Plaintiff did not comply with Det. Williams' instruction to sit down. (*Id.* at ¶ 10.) Det. Williams then allegedly hit Plaintiff so hard that she flew back while grabbing him to avoid

---

[1] Det. Williams did not question any of the other witnesses present in Plaintiff's apartment at the time of the incident. (Pl. Supp. SUMF at ¶ 8; Def. Resp. SUMF at ¶ 8.)

[2] Defendants deny that Det. Williams ever hit Plaintiff or yelled any profanities at her. (*See* Def. Resp. SUMF at ¶¶ 10, 11.) During his deposition, however, Det. Williams acknowledged that he told Plaintiff that "she was acting stupid." (Hardaway Cert., Ex. B at 79.)

hitting the wall. (*Id.*) Plaintiff claims that Det. Williams then slammed her to the floor while yelling more profanities at her. (*Id.* at ¶ 11.)

As a result of her refusal to sit down and her allegedly belligerent conduct, Det. Williams decided to place Plaintiff under arrest. (*See* Pl. Resp. SUMF at ¶ 11; *see also* Hardaway Cert. Ex. B. at 82.) Det. Williams then told Plaintiff to remove her laces, belt and jewelry, which Plaintiff did. (Def. SUMF at ¶ 10; Pl. Supp. SUMF at ¶ 11.) While attempting to place Plaintiff under arrest, Plaintiff pulled her arm away from Det. Williams and began flailing her arms. Det. Williams then grabbed Plaintiff by her shirt, and Plaintiff, in turn, grabbed him by his shirt. A struggle ensued, and Det. Williams pulled Plaintiff to the floor, pushed her down by her face, pulled her arm behind her body, and held her until she calmed own. (Pl. Supp. SUMF at ¶¶ 17-18; Def. Resp. SUMF at ¶¶ 17-18.)[3]

While this was happening, Det. Armstead was processing Crawford in the squad area of the police station. (Pl. Supp. SUMF at ¶ 20; Def. Resp. SUMF at ¶ 20.) Det. Armstead claims to have heard a commotion in the interview room, and loud voices from both Plaintiff and Det. Williams. (Pl. Supp. SUMF at ¶ 20; Def. Resp. SUMF at ¶ 20.) He could not, however, recall the particulars of what Plaintiff and Det. Williams were saying to each other. (*Id.*)

Following the altercation between Plaintiff and Det. Williams, the latter opened the interview room door, and Plaintiff ran out and charged at Crawford. (Def. SUMF at ¶ 11; Pl. Supp. SUMF at ¶ 18; Def. Supp. SUMF at ¶ 18.) Det. Williams and Det. Armstead then restrained Plaintiff and handcuffed her. Sgt. Ramsey, the supervisor of the major crimes unit, subsequently entered the interview room and asked Det. Williams what was happening. (Pl. Supp. SUMF at ¶ 25; Def. Resp. SUMF at ¶ 25.) Det. Williams responded that Plaintiff "went

---

[3] Both parties agree that during the interview, Plaintiff never threatened Det. Williams, or had any physical contact with him apart from when he attempted to place her under arrest. (Pl. SUMF at ¶ 16; Def. Resp. SUMF at ¶ 16.)

off," "got mad," "tried to get at the nephew," and was being placed under arrest. (*Id.*) Sgt. Ramsey then asked Plaintiff if she needed medical attention, and she responded that she did not. (*Id.*) Plaintiff was then placed in a holding cell. (Pl. Supp. SUMF at ¶ 18; Def. Resp. SUMF at ¶ 18 .)

Det. Williams later removed Plaintiff from the holding cell and took her written statement while she was seated in the interview room and handcuffed to a chair. (Pl. Supp. SUMF at ¶ 27; Def. Resp. SUMF at ¶ 27.) In her statement, Plaintiff denied having any knowledge about how Crawford entered her apartment or the circumstances surrounding the firing of the gun. (Pl. Supp. SUMF at ¶ 8; Def. Resp. SUMF at ¶ 8.) Sgt. Ramsey then swore Plaintiff with respect to her statement. (Pl. Supp. SUMF at ¶ 27 Def. Resp. SUMF at ¶ 27.) During his deposition, Sgt. Ramsey stated that he could not remember whether he noticed any injuries on Plaintiff. (*Id.*)

Once Plaintiff finished giving her statement at approximately 11:55 pm, she was placed in another holding cell where she remained until her release on the morning of October 31, 2009. (Pl. SUMF at ¶ 12; Def. Resp. SUMF at ¶ 12.)

Det. Williams ultimately charged Plaintiff with disorderly persons conduct and resisting arrest. (Def. SUMF at ¶ 12; Pl. Supp. SUMF at ¶ 19.) Det. Williams prepared an incident report in connection with Plaintiff's arrest which was approved by Sgt. Ramsey. (Pl. Supp. SUMF at ¶ 24; Def. SUMF at ¶ 17.)[4] In said incident report, Det. Williams claims to have placed Plaintiff under arrest because she became irate, used profanity, repeatedly stood over him, and refused his instruction to sit down and lower her voice. (Pl. Supp. SUMF at ¶ 19.)

The charges against Plaintiff were later dismissed because Det. Williams failed to appear in court on at least three separate occasions. (*See* Def. SUMF at ¶ 12; Pl. Supp. SUMF at ¶ 19.)

---

[4] On the date of the October 30, 2009 incident, Det. Williams and Det. Armstead were under Sgt. Ramsey's direct supervision. (Pl. Supp. SUMF at ¶ 24; Def. Resp. SUMF at ¶ 24.)

C.    Plaintiff's Internal Affairs Grievance

Once released from the police station, Plaintiff went to the emergency room at University Hospital where she was treated for a swollen jaw, laceration to her left ear and soreness all over her body. (Def. SUMF at ¶ 18; Pl. Supp. SUMF at ¶ 23.) While at the hospital, Plaintiff decided to file an Internal Affairs grievance against Det. Williams and met with Lt. George Alberto ("Lt. Alberto"), who was the on-call Internal Affairs investigator. (See Pl. Supp. SUMF at ¶ 23.) Based on his preliminary investigation, Lt. Alberto determined that Plaintiff showed signs of physical abuse because her face appeared to be swollen. (Id.; Def. Resp. SUMF at ¶ 23.) Consequently, Lt. Alberto recommended that the matter be investigated further. (Id.)

Lt. Jevon N. Mintz ("Lt. Mintz") subsequently conducted an Internal Affairs investigation. (See Hardaway Cert., Ex. R.) In connection with said investigation, Det. Armstead and Sgt. Ramsey, respectively, filed Internal Affairs administrative submissions. (See Hardaway Cert., Exs. K, O.)

Based on his investigation, Lt. Mintz determined that although Sgt. Ramsey was aware that Det. Williams used physical force against Plaintiff, he did not require Det. Williams to fill out a use of force form in violation of Newark Police General Orders #63-2. (Pl. Supp. SUMF at ¶ 28; Def. Supp. SUMF at ¶ 28 see also Hardaway Cert. Ex. P at 10.) Further, Lt. Mintz determined that Det. Williams failed to follow proper protocol by not submitting a use of force report following Plaintiff's arrest. (Hardaway Cert., Ex. P at 10.) Nevertheless, Lt. Mintz ultimately concluded that Det. Williams's actions with respect to his use of force were justified, legal and proper. (Id.)

At the time of the incident, Lt. William Sanchez ("Lt. Sanchez") was the Internal Affairs Division Commander and second in command in deciding whether to accept Lt. Mintz's

conclusions. (Pl. Supp. SUMF at ¶ 29; Def. Resp. SUMF at ¶ 29.) With Lt. Sanchez's recommendation, Deputy Chief Joseph Tutela, the Internal Affairs Bureau Commander, accepted Lt. Mintz's conclusions exonerating Det. Williams. (Pl. Supp. SUMF at ¶¶ 34-35; Def. Resp. SUMF at ¶¶ 34-35.)

During his deposition, Lt. Sanchez acknowledged that calling a witness "stupid" during questioning was not in compliance with Newark Police Department policies. (*See* Hardaway Cert., Ex. Q at 45-46.) Lt. Sanchez further testified that arresting a witness for refusing to sit down, or because she was upset or cursing, would also fail to comply with Newark Police Department policies. (*Id.* at 46.) Finally, Lt. Sanchez acknowledged that if a witness refused to cooperate, she should be allowed to leave. (*See, e.g., id.* at 46, 64.) Lt. Sanchez, nevertheless, recommended that Internal Affairs exonerate Det. Williams based on his review of Plaintiff's grievance and the administrative submissions of Det. Williams, Det. Armstead, and Sgt. Ramsey, as he agreed with the conclusion that Det. Williams used the appropriate amount of force to arrest Plaintiff for disorderly conduct. (Pl. Supp. SUMF at ¶ 30; Def. Resp. SUMF at ¶ 30.) Notably, Lt. Sanchez's recommendation to exonerate Det. Williams was limited to Plaintiff's allegation of excessive force. That is, he did not make any recommendation with respect to whether arresting Plaintiff for disorderly conduct was proper. (*Id.*)[5]

D.     <u>Prior Allegations of Excessive Force against Det. Williams and the Newark Police Department's System for Tracking Excessive Force Complaints</u>

The Newark Police Department maintains a system called the IA Pro System that tracks citizen complaints against officers. (Pl. SUMF at ¶ 37; Def. Resp. SUMF at ¶ 37.) Designated Internal Affairs officers are responsible for manually inputting citizen complaints into the IA Pro

---

[5] According to an expert report prepared by Plaintiff's liability expert, Williams Associates, LLC ("Williams Associates"), Det. Williams used excessive force upon Plaintiff; Plaintiff was in custody prior to her arrest; and the Newark Police Department knew or should have known that their mechanism for tracking civilian complaints was insufficient and failed to correct it. (Def. SUMF at ¶ 27.)

system. (*Id.*) If any particular officer receives three excessive force complaints within a 12-month period, an alert is generated, and that officer is sent for mandatory retraining. (*Id.*)[6] The IA Pro system, however, does not maintain excessive force complaints that predate 2005. (Pl. Supp. SUMF at ¶ 37; Def. Resp. SUMF at ¶ 37.) Because of this fact, Deputy Chief Tutela was not aware of any excessive force complaints filed against Det. Williams prior to 2005 when he decided to accept Lt. Sanchez's recommendation to exonerate Det. Williams. (Pl. Supp. SUMF at ¶ 36; Def. Resp. SUMF at ¶ 36.)

Det. Williams' entire disciplinary record reveals a total of ten excessive force complaints and one domestic violence complaint filed against him. (Pl. Supp. SUMF at ¶ 38; Def. Resp. SUMF at ¶ 38.) Specifically, Det. Williams' list of excessive force complaints includes one complaint in 1997, another in 2001, two in 2002, four in 2003, one in 2006, two in 2007, and one domestic violence complaint in 1999. (Pl. Supp. SUMF at ¶ 41; Def. Resp. SUMF at ¶ 41.) None of these complaints resulted in any disciplinary action against Det. Williams. (*Id.*)

During his deposition, Deputy Chief Tutela conceded that the disciplinary record he reviewed in connection with the Internal Affairs investigation lacked important information. (Pl. Supp. SUMF at ¶ 38; Def. Resp. SUMF at ¶ 38.) He acknowledged that if he had known the accurate number of excessive force complaints against Det. Williams, he would have possibly instructed his investigating officer to look into these complaints further. (*Id.*)

On May 3, 2010, a performance evaluation monitoring system was implemented to be used in conjunction with the IA Pro system in order to correct substandard performance and/or inappropriate behavior before initiating a disciplinary process. (Pl. Supp. SUMF at ¶ 40; Def. Resp. SUMF at ¶ 40.) Among other things, the performance evaluation monitoring system

---

[6] Nothing in the record suggests that Det. Williams ever received retraining in the use of force. (Pl. Supp. SUMF at ¶ 41; Def. Resp. SUMF at 41.)

requires a review of annual performance evaluations by supervisory personnel. (*Id.*) Sgt. Ramsey did not think he prepared an annual performance evaluation for Det. Williams in 2009. (*Id.*)

      E.    <u>Alleged Medical Consequences of Plaintiff's Encounter with Newark Police Officers on October 30, 2009</u>

Plaintiff's psychiatric records reveal that she suffers from panic and post-traumatic stress disorder with episodes of marked panic in which she will curl up in a ball and clutch herself. (Pl. Supp. SUMF at ¶ 41; Def. Resp. SUMF at ¶ 41.) According to Dr. Kenneth McNeil, a psychologist who treated Plaintiff, Plaintiff has suffered "significant psychological trauma from the alleged assault on October 30, 2009, including panic attacks, increased fearfulness and anxiety, and increased depression." (Pl. SUMF at ¶ 42, citing Hardaway Cert. Ex. X.) Dr. McNeil recommended that Plaintiff "continue outpatient counseling and psychiatric treatment, to include helping her to practice a relaxation response so that she can learn to settle herself when tense or upset without relying solely on medication for relief." (*Id.*)

Plaintiff was examined on March 13, 2013 by Dr. James R. Cowan, M.D., who opined that the incident on October 30, 2009 traumatized Plaintiff to an extensive degree, causing her to suffer permanent depression and fear. (Def. SUMF at ¶ 24; Pl. Supp. SUMF at ¶ 43; Def. Resp. SUMF at ¶ 43.) Further, Dr. Cowan diagnosed Plaintiff with post-traumatic stress disorder, and recommended that Plaintiff continue "psychotherapy and tak[e] antidepressant medication until there is significant improvement." (Hardaway Cert., Ex. Y.)

## II.   PROCEUDRAL BACKGROUND

On May 15, 2012, Plaintiff filed a ten-count amended complaint against Newark, Det. Armstead, Sgt. Ramsey, and fictitious defendants. In her amended complaint, Plaintiff fails to specify the specific defendants against whom each count is brought. Accordingly, the Court

construes the amended complaint as asserting the following claims: (1) assault and battery against Det. Williams in his individual capacities; (2) false imprisonment and false arrest against Det. Williams, Det. Armstead, and Sgt. Ramsey in their individual capacities under New Jersey law and 42 U.S.C. § 1983; (3) illegal seizure and use of excessive force against Det. Williams and Det. Armstead in their individual capacities under New Jersey law and 42 U.S.C. § 1983; (4) breach of duty against Det. Williams, Det. Armstead, Sgt. Ramsey in their individual capacities, and against Newark under New Jersey law; (5) municipal liability against Newark and Sgt. Ramsey in his official capacity under New Jersey law and 42 U.S.C. § 1983; (6) infliction of emotional distress against Det. Williams, Det. Armstead and Sgt. Ramsey in their individual capacities under New Jersey law; (7) malicious prosecution against Det. Williams, Det. Armstead and Sgt. Ramsey in their individual capacities under New Jersey law and 42 U.S.C. § 1983; (8) abuse of process against Det. Williams, Det. Armstead and Sgt. Ramsey in their individual capacities under New Jersey law;[7] (9) conspiracy against Det. Williams, Det. Armstead and Sgt. Ramsey in their individual capacities under 42 U.S.C. § 1986;[8] and (10) claims against fictitious defendants for violations of the U.S. and New Jersey Constitutions.

On May 24, 2013, Defendants filed a motion for summary judgment. This Court terminated Defendants' motion because the papers submitted in support of and in opposition to Defendants' motion failed to comply with the Local Civil Rules. Defendants re-filed their motion for summary judgment on August 5, 2013.

## III.    LEGAL STANDARD

---

[7] In her opposition brief, Plaintiff states that "[w]ith respect to her abuse of process claim, . . . [she] does not wish to pursue that claim at this juncture and will submit a voluntary dismissal with respect to that claim." (CM/ECF No. 48 at 14.)

[8] Although the amended complaint asserts a claim for conspiracy under 42 U.S.C. § 1986, a claim for civil conspiracy is properly brought under 42 U.S.C. § 1985. As discussed in further detail below, a claim under 42 U.S.C. § 1986 is one for failure to prevent a § 1985 conspiracy.

"Summary judgment should be granted only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Bender v. Twp. of Monroe*, 289 F. Appx. 526, 526-27 (3d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). On a summary judgment motion, the moving party must first show that there is no genuine issue of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact; the non-moving party may not simply rely on unsupported assertions, bare allegations, or speculation. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

## IV.  JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

## V.  LEGAL DISCUSSION

Defendants argue that they are entitled to summary judgment for the following reasons: (1) "Plaintiff's state law claims should be dismissed because they fail to satisfy the threshold requirement of N.J.S.A. § 59:9-2(d);" (2) "Plaintiff's civil rights claims must be dismissed as it is clear that a municipality may not be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior;" (3) "Plaintiff has not established liability against Newark under 42 U.S.C. § 1983 based on alleged deficiencies in training and supervision;" (4) "Plaintiff's claims against Det.

Williams, Det. Armstead, and Sgt. Ramsey should be dismissed because Plaintiff has failed to establish a civil conspiracy against these officers;" (5) "All claims against Sgt. Ramsey should be dismissed as Plaintiff cannot prove a cause of action based on inadequate training or supervision;"[9] and (6) "Plaintiff's complaint against Defendants Det. Williams, Det. Armstead and Sgt. Ramsey should be dismissed as these defendants are entitled to qualified immunity."

The Court will now proceed to address the merits of Defendants' arguments.

A.  Whether Summary Judgment is Appropriate as to Plaintiff's Claims under New Jersey Law

Defendants argue that summary judgment should be granted as to Plaintiff's state law claims because Plaintiff has failed to satisfy the threshold requirement of the New Jersey Tort Claims Act ("NJTCA"). In relevant part, the NJTCA provides that

> [n]o damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.

N.J.S.A. § 59:9-2(d)

The New Jersey Supreme Court has recognized that psychological harm in the form of post-traumatic stress disorder may constitute a permanent loss of a bodily function within the meaning of N.J.S.A. 59:9-2(d). *See Collins v. Union County Jail*, 150 N.J. 407, 420 (1997) (holding that "psychological harm in the form of post-traumatic stress disorder resulting from the rape by the corrections officer, constitutes a permanent loss of a bodily function within the meaning of N.J.S.A. 59:9-2(d)") (internal quotation marks omitted)); *Hoag v. Brown*, 397 N.J.

---

[9] The Court deems it unnecessary to address this argument because there are independent bases upon which to grant summary judgment as to all claims against Sgt. Ramsey in his individual capacity. As discussed below, this Court construes the municipal liability claim against Sgt. Ramsey as being brought against Newark, rather than against Sgt. Ramsey in his individual capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

Super. 34, 63 (App. Div. 2007) (holding that plaintiff satisfied the NJTCA threshold where psychological injuries resulting from physical and verbal abuse could lead reasonable jury to find that the injuries "were permanent and equat[ed] to a substantial loss of a bodily function.").

Here, Plaintiff has put forward sufficient evidence which may lead a reasonable jury to find that Plaintiff has sustained permanent injuries. To provide only one example, Dr. Cowan diagnosed Plaintiff with post-traumatic stress and concluded that she suffers from "*permanent depression and fear*" as a result of the October 30, 2009 incident. (Hardaway Cert., Ex. Y) (emphasis added).

Although Plaintiff's psychological injuries are sufficient to meet the threshold requirement of the NJTCA, Plaintiff has failed to set forth any evidence showing that her medical expenses exceed $3,600. Accordingly, the Court must grant summary judgment as to Plaintiff's claims under New Jersey law. *See* N.J.S.A. 59:9-2(d); *see also Ward v. Barnes*, 545 F. Supp. 2d 400, 417-418 (D.N.J. 2008) (noting that the monetary threshold of the NJTCA is "another threshold requirement").[10] Consequently, the following claims are dismissed to the extent they are brought under New Jersey law: false imprisonment and false arrest; illegal seizure and use of excessive force; breach of duty; municipal liability; infliction of emotional distress; and malicious prosecution.

B.    Whether Summary Judgment is Appropriate as to Plaintiff's Federal Claims

Having determined that summary judgment is appropriate as to Plaintiff's claims under New Jersey law, the Court will now proceed to address the propriety of granting summary judgment as to Plaintiff's federal claims.

---

[10] It bears mentioning that Plaintiff concedes that it is bound by the immunity accorded to public employees in N.J.S.A. 59:9-2(d). (*See* CM/ECF No. 48 at 5-7.) Notably, Plaintiff does not argue that the exception to the NJTCA set forth in N.J.S.A. 59:3-14 applies. Accordingly, the Court presumes that Plaintiff's state law claims are subject to the immunity provided in N.J.S.A. 59:9-2(d).

1. Whether Plaintiff has Established the Essential Elements of a Malicious Prosecution Claim under § 1983 to Survive Summary Judgment

To prevail on a claim for malicious prosecution under § 1983, Plaintiff must establish the following elements:

> (1) the defendants initiated a criminal proceeding;
>
> (2) the criminal proceeding ended in [P]laintiff's favor;
>
> (3) the proceeding was initiated without probable cause;
>
> (4) the defendants acted maliciously and for a purpose other than bringing . . . [P]laintiff to justice; and
>
> (5) [P]laintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).

Plaintiff's malicious prosecution claim against Det. Armstead and Sgt. Ramsey fails as a matter of law because nothing in the record suggests that these defendants filed charges against her. Thus, Plaintiff cannot satisfy the first element of the claim as to these defendants, namely, that they "initiated a criminal proceeding." *See id.* at 186.

As to Det. Williams, however, there is no argument that he charged Plaintiff with disorderly persons conduct in violation of N.J.S.A. 2C:33-2. The parties, nevertheless, dispute whether: (1) Det. Williams had probable cause to arrest; (2) the criminal proceeding ended in Plaintiff's favor; and (3) Det. Williams acted maliciously.

a. Whether Det. Williams had Probable Cause to Arrest Plaintiff

To hold as a matter of law that Det. Williams had probable cause to arrest Plaintiff, this Court must conclude that information within Det. Williams' knowledge at the time of the arrest was objectively sufficient to warrant the belief that Plaintiff had committed, or was committing,

a disorderly persons offense. *See, e.g., Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) ("Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested."). The Court cannot so conclude because the only individuals who truly know what occurred inside the interview room are Plaintiff and Det. Williams.

Indeed, the facts in the record suggest that Det. Williams seized Plaintiff—who was not a suspect of any criminal wrongdoing until she allegedly became disorderly during the course of her interrogation at the police station—when he ordered her to travel in the back of a patrol car and subjected her to an interrogation without giving her the option of refusing. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."). Prior to even considering arresting Plaintiff, Det. Williams also allegedly battered her when she did not answer his questions in the manner he wanted; this alleged use of force was objectively unreasonable as it was unnecessary to achieve any legitimate purpose. *See generally Saucier v. Katz*, 533 U.S. 194, 202 (2001) (indicating that use of force greater than objectively reasonable violates the Fourth Amendment).

Det. Williams then arrested Plaintiff because she was allegedly belligerent and refused to comply with his instruction to sit down, in spite of the fact that Plaintiff had a right to leave the police station at any time.[11] Det. Williams subsequently failed to appear in court on multiple occasions in connection with the disorderly persons conduct charge, resulting in dismissal of said charge.

One reasonable interpretation of these facts is that Det. Williams arrested Plaintiff and

---

[11] It is worth noting that Lt. Sanchez testified at his deposition that arresting a witness for refusing to sit down is inconsistent with Newark Police Department policies.

charged her with disorderly persons conduct to justify his use of force, and failed to appear in court because he knew that the disorderly persons conduct charge was meritless.

Because there are genuine issues of material fact with respect to whether Det. Williams had probable cause to arrest Plaintiff, it would be inappropriate to grant summary judgment as to Plaintiff's § 1983 malicious prosecution claim on the basis that Det. Williams did, in fact, have probable cause to arrest.

     b.    <u>Whether the Underlying Criminal Proceeding ended in Plaintiff's Favor</u>

In *Kossler*, the Third Circuit reaffirmed the well settled principle that "a prior criminal case must have been disposed of in a way that indicates the innocence of the accused in order to satisfy the favorable determination element [of a malicious prosecution claim]." 564 F.3d at 187. "A plaintiff may attempt to indicate his innocence by demonstrating that his prior criminal proceeding terminated in one of the following ways:

       (a) a discharge by a magistrate at a preliminary hearing, or

       (b) the refusal of a grand jury to indict, or

       (c) the formal abandonment of the proceedings by the public prosecutor, or

       (d) the quashing of an indictment or information, or

       (e) an acquittal, or

       (f) a final order in favor of the accused by a trial or appellate court."
*Id.* (citation and internal quotation marks omitted).

"The purpose of the favorable termination requirement is to avoid 'the possibility of the claimant [sic] succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction.'" *Id.* (quoting *Heck v. Humphrey*,

512 U.S. 477, 484 (1994)).

Here, there is no dispute that Det. Williams failed to appear in court on at least three separate occasions, and that the criminal matter against Plaintiff was consequently dismissed for lack of prosecution. The Court is mindful that dismissal of a criminal matter for lack of prosecution is generally an insufficient basis to conclude that the matter ended favorably for purposes of establishing the second element of a § 1983 malicious prosecution claim. *See, e.g., Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) ("A *nol pros* signifies termination of charges in favor of the accused '*only when their final disposition is such as to indicate the innocence of the accused.*'") (emphasis in original); *see also Makboul v. Port Auth. of New York and New Jersey*, No. 09-3540, 2011 WL 4594224, at *6 (D.N.J. Sept. 29, 2011) (holding that dismissal of a criminal case for lack of prosecution failed to satisfy the second element of malicious prosecution claim because "nothing in the record . . . suggest[ed] that the charges were dismiss because the court or the prosecutor determined [that the plaintiff] was innocent of the crimes.").

The Court, however, is also mindful that determining whether a criminal proceeding ended in a manner favorable to a plaintiff bringing a § 1983 malicious prosecution claim requires a "fact-intensive" inquiry that depends on the "particular circumstances" of each case. *See Williams v. New Jersey Div. of State Police*, No. 10-3478, 2012 WL 1900602, at *11 (D.N.J. May 24, 2012) (citing *Kossler*, 564 F.3d at 188).

In *Williams*, the plaintiff was arrested and charged with five motor vehicle and four criminal offenses. *Id.* at *2. As a result of the arresting officer's failure to appear in court on two separate occasions, the Newark Municipal Court dismissed the criminal charges against the plaintiff for lack of prosecution. *Id.* at 3. The *Williams* court held that because the factual

context of the case was "enveloped in alleged racial profiling, harassment and excessive use of force," the dismissal of the criminal charges against the plaintiff "reflect[ed] [his] innocence to establish the favorable termination element to his malicious prosecution claim." *Id.* at *12. Specifically, the Court reasoned that "[d]enying the viability of a malicious prosecution claim under . . . [the] circumstances would circumvent the thrust and purpose of the cause of action and provide an incentive to file false charges, but to not prosecute *in toto*, discover, or appear in court." *Id.*

As discussed above, the facts in the record could lead a reasonable jury to find that Det. Williams arrested Plaintiff as a pretext to justify his unprovoked and unnecessary use of force, and not because he had an objectively reasonable belief that Plaintiff was committing a crime.[12]

As in *Williams*, "Defendants [in this case] have not put forth affirmative proof for why the dismissal of [the disorderly persons conduct] charge[] was not a determination favorable to [Plaintiff]." *See Williams*, 2012 WL 1900602, at *12. More importantly, to accept Defendants' suggestion that a plaintiff can *never* satisfy the second element of a § 1983 claim whenever those charges are dismissed for lack of prosecution would create a perverse incentive for a rogue officer to disclaim liability for malicious prosecution under § 1983 by merely failing to appear in court. In light of the specific factual context of this case, this Court holds that the dismissal of Plaintiff's criminal matter for lack of prosecution is suggestive of her innocence.

For these reasons, the Court will not grant Defendants' motion insofar as Defendants seek summary judgment as to Plaintiff's § 1983 malicious prosecution claim against Det. Williams. However, summary judgment is granted as to Plaintiff's § 1983 malicious prosecution claim

---

[12] As there are sufficient facts in the record to support the inference that Det. Williams arrested Plaintiff for a purpose other than to bring her to justice, Defendant's conclusory argument that Det. Williams acted without malice is without merit.

18

against Det. Armstead and Sgt. Ramsey.

2.   Whether Plaintiff has Established the Essential Elements of a Civil Conspiracy Claim to Survive Summary Judgment

42 U.S.C. § 1985(3) provides that "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, . . . the party so injured or deprived may have an action for recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." To survive summary judgment on her conspiracy claim, Plaintiff must set forth sufficient facts that would allow a reasonable jury to find: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Kwasnik v. Leblon*, No. 05-5210, 228 Fed. Appx. 238, 244 (3d Cir. May 22, 2007) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)).

"The conspiracy element of § 1985(3) requires a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon and an overt act that results in that damage." *Russo v. Voorhees Twp.*, 403 F. Supp. 2d 352, 359 (D.N.J. 2005) (quotation marks and citations omitted).

Defendants argue that Plaintiff has failed to present any evidence to suggest that Det. Williams, Det. Armstead, and Sgt. Ramsey "entered into an agreement to deprive [P]laintiff of her civil rights." (CM/ECF No. 47-8 at 19.) Plaintiff, on the other hand, maintains that although she did not "allege[] in her complaint that the officers conspired with one another based on her

19

gender, a jury could easily find that Det. Williams, Det. Armstead, and Sgt. Ramsey conspired to deprive her of her constitutional rights based on her gender." (CM/ECF No. 48 at 25.) The crux of Plaintiff's argument is premised on her assertion that a reasonable jury could find the existence of an agreement to deprive her of her constitutional rights in light of Det. Williams and Sgt. Ramsey's failure to intervene during the incident between Det. Williams and Plaintiff in the interview room.

As an initial matter, Plaintiff has admitted that her pleaded claim for civil conspiracy is deficient on account of her failure to allege that Det. Armstead, Det. Williams, and Sgt. Ramsey conspired to deprive her of her constitutional rights because of a discriminatory animus. (CM/ECF No. 48 at 25.) On this basis alone, the Court would grant summary judgment as to the civil conspiracy claim. *See, e.g., Watson v. Haverford Twp. Police Dep't*, No. 10-6731, 2012 U.S. Dist. LEXIS 73473, at *53-*54 (E.D. Pa. May 24, 2012) (granting summary judgment as to plaintiff's conspiracy claim, in part, because the [p]laintiff's Amended Complaint fail[ed] to set forth even the semblance of the elements of a conspiracy under Section 1985.").

Even if Plaintiff's complaint were not deficient, the Court would still grant summary judgment as to her civil conspiracy claim because she has failed to present any evidence suggesting either that Det. Williams, Det. Armstead, and Sgt. Ramsey entered into an *agreement* to violate Plaintiff's constitutional rights, or that Det. Armstead and Sgt. Ramsey had any discriminatory animus towards her. Indeed, neither Det. Armstead nor Sgt. Ramsey were present in the interview room while Det. Williams allegedly battered Plaintiff and called her names. Evidence that Det. Armstead and Sgt. Ramsey failed to intervene, without more, does not create a triable issue of material fact as to whether these defendants entered into an agreement with Det.

Williams to deprive Plaintiff of her constitutional rights on account of a class based animus.[13]

Accordingly, the Court will grant summary as to Plaintiff's civil conspiracy claim.

3.    Whether Summary Judgment is Appropriate as to Plaintiff's Municipal Liability Claim against Newark and Sgt. Ramsey

"Claims against individual officials [like Sgt. Ramsey] in their official capacity are the equivalent of a claim against the municipality that employs him [sic]." *Okocci v. Klein*, 270 F. Supp. 2d 603, 613 (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Thus, to the extent that Plaintiff has asserted a municipal liability claim against Sgt. Ramsey, the Court construes said claim as brought only against Newark. *See id.*

It is well settled that "a municipality may be held liable under a § 1983 action only in limited circumstances." *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 688-89 (1978). Specifically, a municipality "may not be held liable under § 1983 for the constitutional torts of its employees by virtue of *respondeat superior*." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006). Rather, "a municipality may be held liable for the conduct of an individual employee or officer only when that conduct implements an official policy or practice." *Id.* (citing *Monell*, 436 U.S. at 690). Thus, to prevail on a § 1983 claim against Newark, Plaintiff "must prove the existence of a policy or custom that has resulted in a constitutional violation in order to make . . . [Newark] liable under § 1983." *See Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (citing *Monell*, 436 U.S. at 694-95). Additionally, Plaintiff must also establish "a plausible nexus or affirmative link between . . . [Newark's] custom [or policy]

---

[13] It bears mentioning that a plaintiff may have a claim for failure to intervene under 42 U.S.C. § 1986. To prevail on such a claim, a Plaintiff must establish that the officers who failed to intervene were aware of a § 1985 conspiracy. *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994) ("[T]ransgressions of § 1986, by definition, depend on a preexisting violation of § 1985") (citation omitted). Thus, establishing that a conspiracy existed is an essential element of a claim brought under 42 U.S.C. § 1986. *See Farneski v. County of Hunterdon*, 916 F. Supp. 2d 573, 588 (D.N.J. 2013) ("As Farneski has not met the threshold requirements for a § 1985 conspiracy, he cannot sustain a § 1986 claim based on such conspiracy."). As Plaintiff has failed to satisfy the conspiracy element of a § 1986 claim, said claim fails as a matter of law.

and the specific deprivation of constitutional rights at issue." *See Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (internal quotation marks omitted).

Here, Plaintiff's municipal liability claim against Newark and Sgt. Ramsey is premised on three theories: (1) *respondeat superior*, (*see* CM/ECF No. 25 at ¶ 29.); (2) Newark's alleged maintenance of "a custom of deliberate indifference" with respect to the allegedly wrongful conduct "of [the] defendant officers," (*see* CM/ECF No. 48 at 19.); and (3) Deputy Chief Tutela's decision to accept Lt. Sanchez's recommendation to exonerate Det. Williams in connection with Plaintiff's Internal Affairs grievance binds Newark for liability purposes, (*see* CM/ECF No. 48 at 15-19.) The Court will address the viability of each of these theories in turn.

### a. *Respondeat Superior*

Any theory of § 1983 municipal liability that is premised on *respondeat superior* fails as a matter of law. *See Kutztown*, 455 F.3d at 245. Thus, the Court will grant summary judgment as to Plaintiff's municipal liability claim to the extent it is premised on a theory of respondeat superior.

### b. Newark's Alleged Custom of Deliberate Indifference

To prevail on a municipal liability claim under a theory of deliberate indifference, "[P]laintiff must 'simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [her] injury.'" *See Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996) (quoting *Bielevicz*, 915 F.2d at 851).

Here, it is undisputed that ten excessive force complaints and one domestic violence complaint were filed against Det. Williams. Det. Williams was never disciplined in connection with any of these complaints in spite of the fact that there were multiple complaints filed against

him in three separate years (2002, 2003 and 2007).

Additionally, it is undisputed that the IA Pro System that was instituted in 2005 did not interface with the prior system in place for tracking citizen complaints. Thus, there is a question of material fact as to whether Newark had a custom of failing effectively to track unprosecuted citizen complaints. *See White v. City of Trenton*, No. 06-5177, 2011 WL 6779595, at *13 (D.N.J. Dec. 27, 2011) (holding that evidence of deficient tracking system created "a genuine issue of material fact as to whether the City had a custom of failing to effectively track unprosecuted complaints of excessive force."). Indeed, the Internal Affairs investigation did not account for any excessive force complaints against Det. Williams prior to 2005.

In light of the number of Det. Williams' excessive force complaints prior to the October 30, 2009 incident and the shortcomings of the Newark Police Department's system for tracking citizen complaints, a reasonable jury may find that Newark and Sgt. Ramsey were aware of, but failed to remedy, a pattern of conduct which resulted in Det. Williams using excessive force against Plaintiff and causing her physical and psychological injuries. Accordingly, the Court will not grant summary judgment as to Plaintiff's municipal liability claim insofar as said claim is premised on a theory of "deliberate indifference." *See Beck*, 89 F.3d at 973-74 (holding that prior excessive force complaints against a police officer may properly be considered by a jury to determine whether municipality was deliberately indifferent to officer's propensity for violence); *White*, 2011 WL 6779595, at *13.

    c.     <u>Deputy Chief Tutela's Exoneration of Det. Williams</u>

It is well settled that "a municipality may be held liable for the conduct of an individual employee or officer only when that conduct implements an official policy or practice." *Hill v. Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006). The circumstances under which "[a]n individual's

conduct implements official policy or practice" include when "a final policy-maker renders that individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." *Id.* "In order to ascertain if an official has final policy-making authority, and thus can bind the municipality by his conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question and (2) whether the official's authority to make policy in that area is *final and unreviewable*." *Id.* at 245-46 (emphasis in original) (citations omitted).

Plaintiff argues that as the Bureau Commander of Internal Affairs, Deputy Chief Tutela "was solely responsible for setting policy and practice within the confines of whether to exonerate police officers accused of violating the constitutional rights of citizens." (CM/ECF No. 48 at 15-16.) Defendants, on the other hand, challenge the accuracy of Plaintiff's characterization of Deputy Chief Tutela's role within the Internal Affairs Bureau. Specifically, Defendants point to a portion of Deputy Chief Tutela's deposition testimony wherein Deputy Chief Tutela claimed that if a complaint is sustained, there is a procedure in place for disciplining the offending officer. (CM/ECF No. 50 at 4; *see also* Hardaway, Ex. S at 46.) Thus, according to Defendants, Deputy Chief Tutela cannot bind Newark because any decision he could make with respect to disciplining any officer would not be final and unreviewable. (*See id.*)

Even if the decision to *take disciplinary action* were not final, the question remains whether Deputy Chief Tutela's decision to *exonerate* Det. Williams was final and unreviewable. Based on the record before it, the Court cannot definitively determine the answer to this question. Because there is a question of material fact as to whether Deputy Chief Tutela's

decision to exonerate Det. Williams was final and unreviewable, the Court will not grant summary judgment with respect to Plaintiff's municipal liability claim to the extent this claim is based on Deputy Chief Tutela's decision to accept Lt. Sanchez's recommendation to exonerate Det. Williams.

4.    Whether Defendants Det. Williams, Det. Armstead, and Sgt. Ramsey are Entitled to Qualified Immunity

Defendants maintain that this Court should grant summary judgment as to all federal claims against Det. Williams, Det. Armstead, and Sgt. Ramsey in their individual capacities because these defendants are entitled to qualified immunity.

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The Supreme Court has set forth a two-step objective reasonableness test to determine whether qualified immunity should be granted." *Barton v. Curtis*, 497 F.3d 331, 335 (3d Cir. 2007) (citing *Saucier*, 533 U.S. at 200-01). As a threshold matter, the Court must first determine whether "viewing the facts in the light most favorable to Plaintiff, the facts alleged show that Defendant[s'] conduct violated a constitutional right." *Bezerra v. DeLorenzo*, No. 07-5670, 2010 U.S. Dist. LEXIS 63443, at *21 (D.N.J. June 23, 2010) (citing *Saucier*, 533 U.S. at 201). If the Court answers this inquiry in the affirmative, it must then determine whether such a right was clearly established at the time of the alleged violation. *See Saucier*, 533 U.S. at 201.

The qualified immunity inquiry provides "ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 860 (3d Cir. 2012) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). "Although qualified immunity is a question of law determined by the

25

Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006).

With this framework in mind, the Court will now address the propriety of granting qualified immunity to Det. Williams, Det. Armstead, and Sgt. Ramsey as to the remaining claims against them.

a.     <u>Det. Williams</u>

Defendants argue that Det. Williams is entitled to qualified immunity because "he had probable cause to arrest [P]laintiff and charge her with disorderly persons and resisting arrest based on her actions during the interview." (CM/ECF No. 47-8 at 24; *see also* CM/ECF No. 50 at 9.) Notably, however, Defendants do not argue that Det. Williams is entitled to qualified immunity with respect to any acts preceding Plaintiff's arrest. Accordingly, the Court construes Defendants' qualified immunity argument vis-à-vis Det. Williams as applying *only* to the remaining federal claims arising out of Det. William's alleged acts in connection with, and subsequent to, Plaintiff's arrest—i.e., false imprisonment and false arrest, and malicious prosecution.[14]

1.     <u>Whether Det. Williams is Entitled to Qualified Immunity as to Plaintiff's False Imprisonment and False Arrest Claim</u>

Claims for false imprisonment and false arrest are properly analyzed under the Fourth Amendment. *See, e.g., James v. Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). In relevant part, the Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a claim

---

[14] To the extent that Defendants argue that Det. Williams is entitled to qualified immunity as to Plaintiff's federal claim for illegal seizure and use of force because Det. Williams had probable cause to arrest Plaintiff, the argument fails because the facts suggest that Det. Williams ordered Plaintiff to be seized and subsequently used excessive force against her prior to ever considering arresting her. Thus, whether Det. Williams had probable cause to arrest Plaintiff is irrelevant to whether Det. Williams is entitled to qualified immunity with respect to Plaintiff's federal illegal seizure and use of force claim.

for false imprisonment and false arrest under § 1983, Plaintiff must demonstrate that she was arrested by a state actor without probable cause. *See Groman*, 47 F.3d at 636 ("[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest."); *see also Vasquez v. City of Jersey City*, No. 03-5369, 2006 WL 1098171, at *5 (D.N.J. Mar. 31, 2006) ("To maintain a claim for unlawful arrest under § 1983, a plaintiff must prove that he was arrested by a state actor without probable cause.").

Here, Defendants offer the conclusory argument that Det. Williams is entitled to qualified immunity because he "had probable cause to arrest . . . [P]laintiff and charge her with disorderly persons and resisting arrest based on her actions during the interview." (CM/ECF No. 47-8 at 24.) For the reasons stated above, this argument lacks merit as there are factual questions regarding the probable cause inquiry that would be inappropriate to resolve on a motion for summary judgment. The Court, therefore, must proceed to consider whether Plaintiff's right not to be detained following an arrest absent probable cause was clearly established.

To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Saucier*, 533 U.S. at 202. Drawing all reasonable inferences in favor of Plaintiff compels this Court to conclude that the right of an unarmed witness who was physically beaten to be free from being arrested and detained for no reason is clearly established. *See, e.g., Wooleyhan v. Cape Henlopen Sch. Dist.*, No. 10-153, 2011 U.S. Dist. LEXIS 53541, at *80 (D. Del. May 17, 2011) ("The right to be free from false arrest is a clearly established right, which necessarily includes the right to be free from false accusations in obtaining the authority to arrest.") (citing *Lippay v. Christos*, 996 F.2d 1490, 1502, 1504 (3d Cir. 1993)).

27

### 2. Whether Det. Williams is Entitled to Qualified Immunity as to Plaintiff's § 1983 Malicious Prosecution Claim

Aside from arguing that Det. Williams had probable cause to arrest Plaintiff, Defendants do not offer any explanation as to why Det. Williams is entitled to qualified immunity as to Plaintiff's § 1983 malicious prosecution claim. As discussed above, whether Det. Williams had probable cause to arrest Plaintiff raises factual questions that would be inappropriate to resolve on a motion for summary judgment.

Construing the facts in the light most favorable to Plaintiff suggests that Det. Williams arrested her without probable cause. Further, as a result of Det. Williams' initiation of an allegedly frivolous criminal proceeding against her, Plaintiff was detained in a holding cell overnight in violation of her Fourth Amendment right. A reasonable officer would understand that arresting Plaintiff without probable cause and initiating a frivolous criminal proceeding against her violate a clearly established Fourth Amendment right to be free from malicious prosecution. *See Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 820 (E.D. Pa. 2001) (noting that the "right to be free from . . . malicious prosecution [under the Fourth Amendment] is clearly established.") (citing *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995)).

#### b. Det. Armstead and Sgt. Ramsey

The only remaining claims against Det. Armstead and Sgt. Ramsey are false imprisonment and false arrest, and illegal seizure and use of excessive force. Thus, the Court will consider the propriety of granting these defendants qualified immunity only as to these claims.

As an initial matter, the Court notes that Plaintiff does not dispute that Det. Armstead and Sgt. Ramsey are entitled to qualified immunity as to her false imprisonment and false arrest claim. The extent of Det. Armstead's involvement in the October 30, 2009 incident was to

restrain Plaintiff after she charged at her cousin. The Court fails to see how Det. Armstead's actions in any way violated any of Plaintiff's constitutional rights.

Although Sgt. Ramsey was Det. Williams' supervisor, he was not present in the interview room. He merely approved Det. Williams' incident report, and nothing in the record suggests that Sgt. Ramsey had any reason to believe that Det. Williams' lacked probable cause to arrest Defendant.

In light of these facts, this Court holds that Det. Armstead and Sgt. Ramsey are entitled to qualified immunity as to Plaintiff's § 1983 claim for false imprisonment and false arrest because Plaintiff has failed to demonstrate that these officers' actions were either objectively unreasonable or violated any constitutional right. Accordingly, the Court will grant summary judgment as to Plaintiff's false imprisonment and false arrest claim against these defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted as to: (1) all of Plaintiff's claims under New Jersey law; (2) all of Plaintiff's claims against Det. Armstead and Sgt. Ramsey in their individual capacities; (3) Plaintiff's conspiracy claim; and (4) Plaintiff's municipal liability claim to the extent that this claim is premised on a theory of respondeat superior. Defendants' motion is denied as to: (1) Plaintiff's federal claim for false imprisonment and false arrest against Det. Williams; (2) Plaintiff's federal claim for illegal seizure and use of force against Det. Williams; (3) Plaintiff's municipal liability claim to the extent that this claim is premised on Newark's alleged custom of deliberate indifference and on Deputy Chief Tutela's decision to accept Lt. Sanchez recommendation to exonerate Det. Williams; and (4) Plaintiff's federal malicious prosecution claim against Det. Williams. Further, to the extent that Defendants have moved for summary judgment as to Plaintiff's illegal seizure

and use of excessive force claim against Det. Williams on qualified immunity grounds, the motion is denied. An appropriate order follows.

Dated: _27_ of September, 2013.

JOSE L. LINARES
U.S. DISTRICT JUDGE